**RICHARD PALMA**
**ATTORNEY AT LAW**
**225 BROADWAY- SUITE 715**
**NEW YORK, NEW YORK 10007**

**MEMBER OF THE BAR**                                                 **TEL. (212) 686-8111**
**NEW YORK**                                                          **E-MAIL -  rpalma177@gmail.com**

April 23, 2024

**ECF**

Honorable Lewis J. Liman
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 15C
New York, NY 10007

> **Re:** **United States v. Tyriek Skyfield**, 23 Cr. 00569 (LJL)
> **Defense requests a variance of 60-months incarceration under 18 U.S.C.**
> **§3553(a).**

Dear Judge Liman:

I represent Tyriek Skyfield who is scheduled for sentencing on May 7, 2024 at 11 a.m., and I submit this letter to aid the Court in fashioning an appropriate sentence, one that is fair to both Mr. Skyfield and the government.   Probation acknowledged the propriety of a variance but based its recommended 18-month reduction on a mistaken belief that Mr. Skyfield's purpose in possessing ammunition was to commit a robbery and thus that his prior 90-month term had not broken what Probation perceived to be a persistent pattern of predation.    I respectfully submit that, (1) where Mr. Skyfield had been shot in the Bronx mere months before by an unapprehended assailant; (2) because he was not seeking to commit a robbery, his guideline range is 70-87 months, which is 50 – 63 months below what Probation believed it to be; and (3) any future sentence would be imposed as a career offender, the actual facts before this Court demonstrate that a sentence of 60 months is sufficient to serve the statutory purposes of sentencing.

A.      <u>The Offense</u>

On January 3, 2024, Mr. Skyfield pleaded guilty to the sole count of an Indictment which charged that, on July 22, 2023, aware that he was a felon, he violated 21 U.S.C. §§ 922(g)(1) by possessing a spent 9mm shell casing.  PSR at ¶¶ 1-2.

B.      <u>The Presentence Report and the Sentencing Recommendation</u>

Where the Government posits that Mr. Skyfield possessed the subject shell casing in connection with the commission of another offense, the Probation Department follows U.S.S.G.

Page-2
letter to Hon. Liman, U.S.D.J.
April 23, 2024

§2K2.1(c)(1)(A)'s direction to observe §2X1.1(a)'s command to apply the guideline of that object offense to determine the base offense level.  PSR, at ¶¶ 4, 4(a)(iii), (iv), 14 & n.3, 28.

In the absence of any evidence that Mr. Skyfield intended the discharge to inflict injury, the prosecutors apparently abandoned their original theory, presented in its *Pimentel* letter, that Mr. Skyfield possessed the ammunition in order to commit an aggravated assault. Inexplicably, Probation itself has adhered to the prosecutors' originally theory.  See PSR at ¶44 ("On August 4, 2023, USPO Bill Pompei submitted a petition for a warrant on a violation of supervised release…  The memo outlined two violation specifications, each related to the instant offense, …possessing a firearm *and committing assault in the second degree,* in New York State").  As defined in Article 120 of New York's Penal Law, each degree of assault requires intent.  See N.Y. Penal Law § 120.10(1), § 120.05 (1),(2)("With intent to cause serious physical injury to another person"); § 120.05 (1), (2)(same).  See also United States v. Scott, 954 F.3d 74, 106 & n.16 (2d Cir. 2020); § 15.05(1) (defining intent).

On the uncharged theory that Mr. Skyfield possessed the subject shell casing in connection with the commission of another offense, an offense that, despite the victim's retraction of his initial claim that $16,000 was stolen from him, it newly identifies as a robbery, Probation looked to §2B3.1(a), the guideline governing robbery, to find Mr. Skyfield's base offense level of 20. PSR, at ¶¶ 4(a)(iv), 28.  Where the "robbery" involved the discharge of a firearm, U.S.S.G. § 2B3.1(b)(2)(A) requires a 7-level enhancement.  Id. at ¶¶ 4(a)(v), 29.  On the theory that the injury to the "robbery victim's" heel was "a gunshot wound" and that it was between "bodily injury" and "serious bodily injury" in severity, Probation added 3-more-levels to Mr. Skyfield's offense, in accordance with U.S.S.G. § 2B3.1(b)(3)(D).  PSR, at ¶¶ 15, 30.  He having accepted responsibility for his crime through a prompt plea, the Probation Department recommended the full 3-level reduction pursuant to § 3E1.1(a, b). PSR at ¶¶ 4(a)(vii), 25-26, 36-37.  Thus, according to the Probation Department's calculations, the 31-year-old Mr. Skyfield's total offense level is 27, his Criminal History Category is V and his guideline range is from 120-150 months of imprisonment.  PSR at ¶¶ 38-48, 88.

Apparently aware of the vulnerabilities in the alternative §2K2.1(b)(6)(B) possessed-ammunition-in-the-course-of-another-offense theories, both the Government and the Probation Office posit the fallback theory, based on §2K2.1(a)(2), that, because Mr. Skyfield possessed ammunition after "sustaining at least two felony convictions of either a crime of violence or a controlled substance offense," that Mr. Skyfield's minimum possible base offense level could be 24.  PSR, at ¶¶ 4(a)(vii) n.1.; 28 n.4.  Were the Government to fail to meet its burden, Mr. Skyfield's true Category V and Adjusted Offense would be Level 21, which is a guidelines range of 70-87 months.  Although it would only control if the Government failed to prove the robbery predicate to the application of §2B3.1(a), the Probation Office nevertheless suggests that even if it becomes appropriate to look to §2K2.1(a)(2) for Mr. Skyfield's base offense, a four level USSG §2K2.1(b)(6)(B) increase would still be warranted on the theory that Mr. Skyfield used or possessed the ammunition in connection with another felony, PSR, at ¶ 28 n.4, one Probation fails to specify.

**Page-3**
**letter to Hon. Liman, U.S.D.J.**
**April 23, 2024**

C.      <u>Factual Objections</u>

      1.   <u>Mr. Skyfield Objects To His Identification As The Shooter.</u>

      He having allocuted to no more than possessing "shell casings" in "the Bronx" on July 22, 2023,[1] Mr. Skyfield objects to his identification as the shooter depicted in the Needham Avenue incident. See PSR, at ¶ 18 ("On July 23, 2023, at approximately 2:58 a.m., a car *investigators believed to be the white SUV identified at the scene of the shooting*, arrived and parked near a club located at the intersection of Atlantic Avenue and Woodhaven Boulevard in Queens. Surveillance footage.")   He objects, as well, to the claim that the car seen leaving the shooting scene, one "investigators believed to be [a] white SUV," was ever actually "identified."

      As argued in the suppression context in support of his claim that the evidence supporting his arrest failed to satisfy the significantly lower probable cause standard, see DE 28-30, 38, Mr. Skyfield's was not "identified" as Robber-1 by either "victim" in any approved legal procedure,

---

[1]   The Court: OK.
    Mr. Palma: Read the statement.
    The Defendant:  Um, on July 22nd in the Bronx, I          --
    The Court:  July 22 of what year, sir?
    The Defendant:  2023.      -- I knowingly possessed ammunition. Specifically shell casings. And at this time, I knew I was a felon.
    The Court:  OK. When you had shell casings, were they shell casings from a bullet that had live ammunition?
    Mr. Palma:  Your Honor, what I would state for the record, it would be my understanding the government's view of the evidence is that they would be able to prove at trial that Mr. Skyfield possessed live ammunition. But according to the indictment, it reads that he possessed ammunition, specifically a Luger shell casing.
    The Court:  Mr. Palma, what I want to make sure of, given that your argument previously is that this is a valid plea, and so I think it's an appropriate question for me to ask that question of him.
    Mr. Palma:  I understand, your Honor. I will say that what I prepared for him tracks the language of the indictment. I think that, under the rule, that is sufficient.
    The Court:  OK. All right. Let me ask, I'll ask the government that question in a moment. But you knew that you were a felon at the time that you possessed the ammunition, is that correct?
    The Defendant: Yes.
    The Court:  And you did possess ammunition, is that right?
    The Defendant: Yes.
    The Court:  And did you know that what you were doing was wrong and illegal?
    The Defendant:  Correct.
    The Court:  OK. Does the government have any further questions that they wish me to ask?
    MR. ROSENBERG: Nothing further on that, your Honor.
P. 32-33.

Page-4
**letter to Hon. Liman, U.S.D.J.**
**April 23, 2024**

nor by any parole, probation or police officer who knew him, but rather from a guess, from grainy private video footage, as to "*the likely make and model* of the white BMW," Gov't Dec 16, 2023 Memorandum in Opposition ("Gov't Memo") at 5, as well *as the approximate model* year. Id.

How "educated" the NYPD's guesswork was remains unclear.  As best can be determined by its DD-5s, the NYPD consulted area License Plate Readers and noticed that a car *with a similar silhouette* to that in which *the nonshooter was believed* to have fled had passed an LPR at a very busy Bronx intersection .6 miles away on the highly trafficked Boston Post Road almost three hours earlier.[2]  Tracing *that* car's movements, they learned that Mr. Skyfield had exited it six hours later at a Queens strip club.  On the sheer speculation that the bearded black guy with braided hair entering a strip club at 3 a.m. was the only bearded black guy with braided hair who could have discharged a gun in the heavily Jamaican Baychester neighborhood of the Bronx, Detective Abruzzesse, the NYPD detective investigating the charged shooting, showed Detective Hogue, a detective investigating an incident in which Mr. Skyfield was shot, *not a picture of the July 22 shooter* but rather a picture of Mr. Skyfield entering the strip club.  In Hogue's opinion, sworn to nowhere, the strip club patron who displayed Mr. Skyfield's license was *the victim in Hogue's case*.  Establishing that Mr. Skyfield entered a strip club a few months after being shot does nothing to confirm his identity as the July 22 Needham Avenue shooter.

2.  Mr. Skyfield Objects To The Finding That He Possessed The Casings In Order To Commit A Robbery.

Given the Government's own uncertainty over the charged offense's objective and the equivocal evidence that the charged offense had any alternative criminal objective at all, Mr. Skyfield objects to the "fact" that he possessed shell casings in order to commit a robbery. Compare October 18, 2023 and December 29, 2023 *Pimentel* letters at § A(3) (because the defendant used or possessed the ammunition in connection with the commission or attempted commission of another offense, to wit, *aggravated assault*) and PSR at ¶44 ("On August 4, 2023, USPO Bill Pompei submitted a petition for a warrant on a violation of supervised release…  The memo outlined two violation specifications, each related to the instant offense, …possessing a firearm and committing *assault in the second degree, in New York State*") with PSR at ¶¶4, 4(a)(3) *and* ¶14 [3] ("Approximately five minutes later, as Victim-1 and Witness-1 were sitting in

---

[2] Contrary to the Government's *italicized* calculation that the 7:13 p.m. sighting of a similar silhouette *occurred "less than two hours before the shooting"* id, (emphasis in original), 7:13 p.m. occurs *more than* two hours before 9:56 p.m.

[3] The purported purpose of a *Pimentel* letter is to "inform *defendants*, *prior* to accepting plea agreements, as to the likely range of sentences that their pleas will authorize under the Guidelines."  United States v. Pimentel, 932 F.2d 1029, 1034 (1991).  Here, however, the February 9, 2024 *Pimentel* letter that informed Mr. Skyfield's decision to plead guilty represented the Government's theory of the case to be that Mr. Skyfield's objective in possessing ammunition was to enable him to *assault* Victim-1.  On that theory, the *Pimentel* explained that the Government envisioned that Mr. Skyfield's total offense level would be 25.  The

Page-5
letter to Hon. Liman, U.S.D.J.
April 23, 2024

the black BMW, two individuals approached the black BMW brandishing firearm*s* and
*demanding that they turn over their money.* The two individuals took Witness-1's car keys and
Victim-1's debit card, credit card, and iPhone.). (all emphasis added).


     a.   <u>Mr. Skyfield Objects To The Conclusion That Both Robbers Brandished Firearms</u>

      He objects, as well, to the "fact" that both individuals were brandishing firearms. See
USAO 433 (Robber-2 *simulated* firearm possession) (emphasis added).


     b.   <u>Mr. Skyfield Objects To The Claim That Robber-1 Fired Shots "At" Anyone</u>

      Finally, Mr. Skyfield objects to the "fact" that Robber-1 fired shots "at" anyone. It is
clear from the fact that they neither hit nor even deterred Victim-1, their supposedly intended
victim, that, fired from point blank range, the shots were mere warnings and that neither was
meant to hit Victim-1. <u>Compare</u> PSR at ¶14 (Skyfield fired two shots … *at* an individual
(Victim-1) <u>with</u> PSR at ¶11("NYPD officers found fragments of one bullet *in the pavement* at the
scene.) <u>and</u> PSR at ¶ 15 ("SKYFIELD then fired a gunshot *that ricocheted off the ground* and
struck Victim-1 in the foot. As Victim-1 continued to follow SKYFIELD, he fired another
gunshot *in Victim-1's direction* that did not strike Victim-1.")

      According to the pertinent police reports, as the robbers departed, Victim-1 followed
"Robber-1" in an attempt, not to recover the $16,000 in cash, his credit cards or his identification
card, but rather his purple i-Phone 14. USAO 449-450. In an attempt to dissuade him from
further pursuit, the robber shot not at Victim-1 but at the ground; the bullet ricocheted, however,
and grazed Victim-1's right heel on its rebound. USAO 450; Horkan UF-61 # 10. The injury
was insufficient to deter Victim-1. He persisted in his pursuit, provoking the robber to fire a
second warning shot. USAO 450. Robber-1 then fled on foot down Needham toward East 222nd
St. USAO 003; USAO 008. Victim-1 returned to the BMW with a wound to his foot. USAO
445. When he removed his sock, a bullet fragment fell out. USAO 449.

      While Victim-1 claimed that the "robbery" was committed by strangers, PSR at ¶16, Mr.
Skyfield was no stranger to Victim-1. <u>Compare</u> USAO 432, 433 (stating that the suspect was a
stranger to the victim and not believed to be on parole) <u>with</u> PSR at ¶65 ("Ms. Blackwood [Mr.
Skyfield's mother] …stated that she was aware that the defendant and the victim were friends.')
While it might not acknowledge that it was Mr. Skyfield who purchased Victim-1's plane ticket
from California, the Government will not dispute that it found a picture of Victim-1's ticket on
the phone the Marshals seized from Mr. Skyfield's home. USAO 1215. Victim-1 spent the night
before the "robbery" in the Skyfield family's New Rochelle home. A video shows Victim-1
asking for his phone from someone, the person identified as Mr. Skyfield, that Victim-1 calls by
the name "Ty". Complaint at ¶ 3(d) ("As Shooter-1 was leaving the scene of the Shooting, an

---

Government provided Probation another letter, however, post-plea, that argued that Mr.
Skyfield's ammunition possession was related to *not to assault but rather to robbery*. See PSR
at ¶16. That letter agitated for an offense level of 27. <u>Id</u>.

RICHARD PALMA
ATTORNEY AT LAW

individual in the vicinity of the Shooting stated, in part, "Ty, Bro, let me get my phone, Bro. Ty. Ty, bro, come on, bro, you really going to do me, bro? You really going to do me, bro?").

There is no corroboration for either victim's robbery claims. USAO 447. While he never repudiated his claim that there was $16,000 in the suitcase his friend "Ty" left on the street for him, Victim-1 ultimately recanted his initial claim that the "robbers" stole that money from him. Witness-1 never claimed he lost *any* money. When asked by investigating Detective Abbruzzese to share the password of his supposedly stolen i-phone so that its' location could be tracked through Apple's FindMyIphone function, Victim-1 failed to cooperate, claiming that he forgot his password. July 22, 2023 BWC Video, at 22:11:05 - 22:11:50 (USAO 746). While Victim-1 was seen on video asking the shooter for his phone, exactly how the shooter came to possess that phone remains unclear. While robbers might seize a victim's cell phone to impede the victim's ability to summon the police, Witness-1 never reported that his phone was stolen. See USAO 457("Victim-1 states he never saw the two individuals before. *Before Victim-1 was able to call 911* police arrived on scene.")  Neither did Witness-1 call 911 to report a robbery. Id. ( "On July 22, 2023, at approximately 2155 hours members of 47 patrol *responded to a report of a shot spotter activation* in front of 1765 Needham Avenue…").  Surely "robbers" who were aware that their victim possessed $16,000 in cash, would not neglect to relieve him of it.

Doubts as to Victim-1's veracity are not unique to the defense.   Considered in the context of the conflicting video, Victim-1`s conditional cooperation and varying accounts caused concerns in the lead detective and the Government, too.  On July 31, 2023, presumably after reviewing all the relevant video requisitioned from the various private security cameras stationed along Needham Avenue, Det. Abbruzzese reached out again to Victim-1, who had returned to California, to ask whether Victim-1 was sticking to his story. Abbruzzese UF-61 #50 USAO 497. Victim-1 said he was. Id. What speaks loudest, perhaps, is that, given the opportunity to identify the other offense as the one Victim-1 first described, the Government itself chose to forego the robbery theory in favor of assault.

Should the Government manage to convince the Court that he *forcibly* took something from at least one of the victim(s) *on the night of July 22*, Mr. Skyfield objects to the unsupported factual conclusion, (on which the legal conclusion that the injury to Victim-1's heel merited a 3-level U.S.S.G. § 2B3.1(b)(3)(D) increase in offense level was grounded), that the injury "required" treatment at a hospital.  *Compare* PSR at ¶ 10 ("the EMT informed the officer that Victim-1 had suffered a gunshot wound to the heel of his right foot. He received treatment at the scene before *being transported to* the hospital.") with PSR at ¶ 30 (increasing offense because "a gunshot wound to the right heel, which *required* treatment at a local hospital" was of a degree "between that of bodily injury and serious bodily injury")(all emphasis added).  While there is no dispute that Victim-1 was taken to Jacobi Hospital, in that his injury did not at all deter him from continuing his pursuit of an armed purported robber and that his treatment was restricted to the ER after which he was released, it is as yet unclear that Victim-1's injury "required" a trip to a hospital.

Purely "precautionary" measures are "not the type of 'medical attention' that the Guidelines contemplate as being sought after significant injuries." United States v. Lewis, 18 F.4th 743, 749 (4th Cir. 2021) (quoting United States v. Lancaster, 6 F.3d 208, 209-210 &n.2 (4th

Page-7
letter to Hon. Liman, U.S.D.J.
April 23, 2024

Cir. 1993) (per curiam) See also <u>United States v. Harris</u>, 44 F.3d 1206, 1218 (3d Cir. 1995) ("If, as in Lancaster, medical attention would be sought by an ordinarily prudent person for the purpose of diagnosis but no treatment ensues, that attention does not help to establish the significance of the injury.").

As the Court will recall Victim-1 was not a New York native and had spent the previous evening at Mr. Skyfield's home. See PSR at ¶ 12 ("Victim-1—who was visiting from California—").  Whatever transpired on Needham Avenue that night, it is highly unlikely that Victim-1 would have wanted to return to the Skyfield family residence or that he would have been welcome there.   It is not clear, then, that he went to the hospital because his injury *required* a visit to the ER or whether the "minor" "laceration" on his heel could have been self-treated at home had Victim-1 had a home to return to. USA 451 (*Dr. Petrie, the attending ER physician… stated the aided suffered a laceration to his right heel…Dr. Petrie stated …the the injuries were minor.")*(emphasis added); USA 457 ("Attending Dr., Petrie, ..states the CV had a *laceration to the right heel*.")(emphasis added)

D.    <u>Legal Objections</u>

Should the Government manage to convince the Court that he *forcibly* took something from at least one of the victim(s) *on the night of July 22*, Mr. Skyfield objects to the legal conclusion that the injury to Victim-1's heel constituted even "bodily injury", much less something more severe.   See PSR at ¶ 22.  ("A firearm was discharged during the offense and the victim sustained bodily injury between serious bodily injury and that of bodily injury."); PSR at ¶ 30 (recommending 3- level § 2B3.1(b)(3)(D) increase because "a gunshot wound to the right heel, which *required* treatment at a local hospital" was of a degree "between that of bodily injury and serious bodily injury").

As that term is defined in Application Note 1(B) to U.S.S.G. § 1B1.1, "Bodily injury" means any significant injury; <u>e.g.,</u> an injury that is painful and obvious, or is of a type for which medical attention *ordinarily would be sought*. U.S.S.G. § 1B1.1, Application Note 1(B) (emphasis added).   According to a leading commentator, "[t]he Commission's definition of 'bodily injury' remains narrower than the definition of bodily injury used in various federal statutes."  Thomas W. Hutchison et al., *Federal Sentencing Law and Practice*, § 1B1.1. Authors Comments 1997 Amendments §1(b)(ii) (February 2024) (hereinafter "FSLP").  "The Commission does not seem to intend that the term "bodily injury" be a residual category encompassing *any physical injury that is neither serious bodily injury nor permanent or life-threatening bodily injury*." FSLP, § 1B1.1. Authors Cmt §5(b)(ii).  "Not only does application note 1(b) state that the injury must be "significant," but commentary to § 2A2.3 suggests "that not every wounding constitutes bodily injury."  FSLP § 2A2.3 Authors' Cmt. 3, *infra* (emphasis added).  See, e.g., <u>United States v. Zuniga</u>, 720 F.3d 587, 593 (5th Cir. 2013) (witness statement that victim was trampled as defendants exited home and had pain in her arm insufficient, without more, to establish bodily injury).

Page-8
letter to Hon. Liman, U.S.D.J.
April 23, 2024

It is "the resulting physical injury" rather than the defendant's conduct that is the determining factor in assessing. United States v. Spinelli, 352 F.3d 48, 59 (2d Cir. 2003). See e.g. United States v. Zuniga, 720 F.3d 587, 593 (5th Cir. 2013) (witness statement that victim was trampled as defendants exited home and had pain in her arm insufficient, without more, to establish bodily injury); United States v. Guerrero, 169 F.3d 933, 945–47 (5th Cir. 1999) (fact that victim was struck on his back with a shotgun during robbery does not establish bodily injury); United States v. Perkins, 89 F.3d 303, 308 (6th Cir. 1996) ("[t]he basis for this enhancement is not the striking of the victim in the head … rather, it is the fact that doing so caused physical injury"). Here, then, while it was a bullet, albeit an errant one, that caused the injury, the Court's focus should be on the gravity of the physical harm. By all official accounts, the damage was minimal.

According to Detective Patrick Horkan's Summary of Investigation, both the responding EMT and the treating ER physician described Victim-1's injury as "minor." USA 451 ("On July 22, 2023, at approximately 2335 hours DET Abbruzzese and myself did speak with FDNY EMT Streim regarding C/V EMT Streim stated the aided had suffered a gunshot wound to the heel of his right foot. The C/V told him the perpetrator shot towards the ground and he saw the round ricochet. *EMT Streim stated there is no exit wound and the injury appeared to be minor*. ACR # 89357930); USA 451 ("On July 22, 2023, at approximately 2350 hours DET Abbruzzese and myself did speak with *Dr. Petrie, the attending ER physician. He stated the aided suffered a laceration* to his right heel. He said the aided may have a possible heel fracture, pending awaiting x-ray. Dr. Petrie stated the aided was stable and *the injuries were minor.")*(emphasis added); USA 457 ("C/V was transported to Jacobi Medical Center via ambulance. C/V suffered one gunshot wound to his right heel. Attending DR, Petrie, stated his injuries were non life-threatening. He further states the CV had a *laceration to the right heel*, it is not apparent at this time if any ballistics are lodged in his heel.")(emphasis added).

Neither is the fact that Victim-1 was taken to the hospital determinative. Purely "precautionary" measures, such as visits for evaluative or diagnostic purposes, are "not the type of 'medical attention' that the Guidelines contemplate as being sought after significant injuries." United States v. Lewis, 18 F.4th 743, 749 (4th Cir. 2021) (quoting United States v. Lancaster, 6 F.3d 208, 209-210 &n.2 (4th Cir. 1993) (per curiam) See also United States v. Harris, 44 F.3d 1206, 1218 (3d Cir. 1995) (reversing bodily injury enhancement where witness who had been sprayed with mace was treated by medical personnel but district court made no findings regarding extent of pain or injury or why medical attention was given, "If, as in *Lancaster*, medical attention would be sought by an ordinarily prudent person for the purpose of diagnosis but no treatment ensues, that attention does not help to establish the significance of the injury.")

As defined in Application Note 1(M), to qualify as "serious bodily injury," an injury must involve extreme physical pain or the protracted impairment of a function of a bodily member…; or require medical intervention such as surgery, hospitalization, or physical rehabilitation. "The Commission amended the definition of serious bodily injury in application note 1(j) by inserting "protracted" before "impairment." Id. at §1(b)(iii). Where the only evidence in the record describes the injury as minor, and there is no evidence that Victim-1 suffered *any* pain for *any* period, there is no support whatsoever for a conclusion that he suffered any more than "physical injury."

**Page-9**
**letter to Hon. Liman, U.S.D.J.**
**April 23, 2024**

"The defendant's intentions and actions are not off limits to judges making sentencing decisions." Spinelli, 352 F.3d at 58.  Should the Court be willing to consider them, there is no dispute that whatever harm Victim-1 suffered was unintentionally inflicted.  While the shooter here surely assumed the risk of injury by firing the weapon, had he intended to hurt his pursuer, he would not have fired at his feet.  In the absence of any victim impact statement, it would not be unreasonable to embrace the rationale for the rule of lenity and err on the side of less serious injury.

E.    The § 3553(a) Factors Militate For A Bottom-Of-The- Guidelines Sentence

Congress has counselled that "[t]he court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. U.S.S.G. Chapter 5, Part A, Introductory Commentary citing 18 U.S.C. § 3553(a).  Nevertheless, "[t]he United States is believed to be the world's leader in incarceration, spending $80 billion a year to keep more than two million people behind bars." Zolan Kanno-Youngs and Maura Turcotte, *Thousands of Prisoners Were Sent Home Because of Covid. They Don't Want to Go Back*, The NY Times (June 27, 2021).

 In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2017) (quoting Guido Calabresi, What Makes a Judge Great: To A. Leon Higginbotham, Jr., 142 U. Pa. L. Rev. 513, 513 (1993); see also Edward J. Devitt, Ten Commandments for the New Judge, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 562  U.S. 476, 487-88 (2011) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).  The punishment should fit the offender and not merely the crime. Pepper v. United States, supra (citing Williams, 337 U.S. at 247 (1949)).

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

United States v. Gupta, 904 F. Supp. 2d 349, 350 (2012) (Rakoff, J.) (emphasis added).  See also United States v. Adelson, 441 F. Supp. 2d 506, 509 (2006) (Rakoff, J.) ("As many have noted,

Page-10
letter to Hon. Liman, U.S.D.J.
April 23, 2024

the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.").

While he seems thus far to have avoided seriously injuring anyone, at least as a free man, because there is a substantial risk that someone who arms himself unlawfully will do at least unintentional damage, Mr. Skyfield's misconduct was unquestionably serious.  See § 3553(a)(2)(A).  Charged with delivering his friend's $16,000 in cash in the same neighborhood in which he had been shot by an unapprehended assailant mere months before, Mr. Skyfield may have armed himself to defend himself and/or his friend's property.  In any event, acknowledged by Probation to have done its damage as a ricochet off the pavement rather than directly, the discharge here was clearly initiated in the way of a warning and was never intended to inflict any sort of injury. PSR at ¶15, p. 29 ("Skyfield was involved in a shooting incident in which a victim was struck in the heel of the foot by a ricochet bullet."). Consistent with Judge Rakoff's critique of the guidelines, increasing punishment by the benchmark of the severity of an injury everyone agrees was unintentional serves none of the statutory purposes of sentencing.  Clearly the victim, who knew and chose to pursue him, did not believe he was at any risk from the shooter.

One who looks no further than his rap sheet might conclude that Mr. Skyfield deserves no sympathy, his history, however, suggests that, in the environment in which he was raised, his characteristics are more the rule than the exception.  See § 3553(a)(1).  As set forth in the PSR at ¶¶ 53-86, his history reveals him to be the illegitimate issue of a short-lived relationship between Jamaican immigrants whose most frequent visitor in his formative years was not his father, but violence.  At 31, he has already outlived his philandering father, who had sired a dozen other children with as many women before his murder at age 28, when Mr. Skyfield was only an infant. PSR at ¶¶ 53-54.  Mr. Skyfield has always regretted his begetter's unavailability to play any sort of formative role in his life. Id. at ¶ 56.  While his mother eventually found a committed companion, Mr. Skyfield never developed a close relationship with the man he called his stepfather and he never viewed him as a father figure.  Id. at ¶ 53.

That paternal void notwithstanding, his industrious mother, Denise Blackwood, nevertheless provided Mr. Skyfield a sound upbringing with good values.  PSR at ¶ 57, 61.  Her hard work notwithstanding, tough times were frequent for an easily-exploited immigrant and Ms. Blackwood was compelled to seek public assistance to get by.  Id. at 55-57.  When her work prevented his mother's presence, Mr. Skyfield and his older half-sister stepped up to parent his younger half-brother.  Id. at 53.

Tragedy visited again in Mr. Skyfield's teen years when his stepfather, too, was murdered. Id. ¶ 53.  In an effort to free his overburdened single mother of financial responsibility for him, he sought to establish economic self-sufficiency.  Seeking to exploit his ambition and naivete, an older group of young men recruited him to join them in robbing his Baychester neighborhood's biggest businessmen - marijuana dealers.  PSR at ¶¶ 44, 56, 62.  That led to a decade in a federal prison, which may well be the only reason he has outlived his father. Id.  Not long after his release, one of his half-brother's succumbed to an overdose and a teenaged cousin was murdered. Id. at ¶ 54.

Entirely predictably, he arrives before the Court having pursued the path blazed by the only role models within view. PSR at ¶¶ 53-56.  While his missteps have been many, it is important to understand that, where circumstances have conspired to deprive her of his father and Mr. McDermot, Mr. Skyfield took modest risks with his freedom not due to any wanton materialism or desire for extraordinary pecuniary gain but in an effort to do something for his deteriorating mother, move her from the depressed Bronx neighborhoods in which she had long dwelt,  to a more upscale area of New Rochelle, while she was still healthy enough to appreciate it.  PSR at ¶¶ 53.

It is true that Mr. Skyfield put himself first while playing catch-up for his lost decade, his selflessness where his mother is concerned suggests that Mr. Skyfield has clearly absorbed good values and used them to foster the tightly-knit household that fate denied him.  PSR at ¶¶ 68-71.

Despite his few marketable skills, Mr. Skyfield has exhibited some industry both in his teenaged years and since his release.  PSR at ¶¶ 78-82.  Demonstrating a commitment to making a fresh start, he participated in positive programming throughout his prolonged incarceration, participating in job training, earning his GED and even some college credit. PSR, at ¶ 76-77.

Even aware that his misstep was being mischaracterized in a manner meant to significantly increase his sentencing exposure, Mr. Skyfield accepted responsibility by pleading guilty.  Id. at ¶¶ 36-37.  See § 3553(a)(1). Mr. Skyfield's institutional achievements, work history and acceptance of responsibility, demonstrate some potential for rehabilitation and suggest that, by putting him back on the path to becoming a productive citizen, a variant sentence would neither deprecate the seriousness of the offense nor undermine respect for the law and would therefore be just.  See PSR at ¶¶   18 U.S.C. § 3553(a)(2)(A).

F.    Pertinent Programming

"[A] court may not impose or lengthen a prison sentence ... to promote rehabilitation." Tapia v. United States, 564 U.S. 319, (2011); 18 U.S.C. 3582(a) (recognizing that "imprisonment is not an appropriate means of promoting correction and rehabilitation").  Nevertheless, 18 U.S.C. § 3553(a)(1) requires the court to consider "the kinds of sentences available."

Although they are not binding, in that regard, Congress has directed the BOP to account for judicial recommendations relative to placement and programming decisions. 18 U.S.C. § 3621(b)(4)(A, B) (In designating prison placement, the BOP shall consider "any statement by the court that imposed the sentence (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate").  See U.S. v. Herrington, 187 Fed.Appx. 140, 2006 WL 1976165 (3d Cir. 2006) (together with the other § 3621(b) factors, the BOP should consider the sentencing judge's community confinement placement recommendation).

The Bureau strives to follow all judicial recommendations where possible, recognizing that they are carefully thought out and important to the sentencing courts who make them. Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 247 (3d Cir. 2005) (BOP regional counsel acknowledged at oral argument that BOP follows judicial recommendations in approximately

Page-12
letter to Hon. Liman, U.S.D.J.
April 23, 2024

85–90% of cases).  More recent BOP data claims at least partial compliance with 74 percent of
recommendations. Recommendations are usually set forth in the judgment and commitment
order's imprisonment section.

 The PSR documents both that Mr. Skyfield has substance abuse problems and that, in
part due to his own lack of diligence, they have thus remained largely unaddressed. PSR at ¶¶
72-74; pp. 28-29. He therefore asks that Your Honor recommend placement in the BOP's
Residential Drug Abuse Treatment Program ("RDAP").

 The BOP operates three drug abuse programs. Alan Ellis & Todd Bussert, *Residential
Drug Abuse Treatment Program (RDAP)*, Criminal Justice (Winter 2016).
https://alanellis.com/wp-content/uploads/2016/08/aba-rdap.pdf (last visited April 13, 2024).  The
first program is the 12- to 15-hour voluntary Drug Abuse Education Course offered at all
institutions, designed to teach inmates about the consequences of drug/alcohol abuse and
addiction by reviewing their personal drug use and the cycle of drug use and crime. Id. The
second program is the 12- to 24-week (90–120 minutes per week) Non-Residential Drug Abuse
Treatment Program (NRDAP), which is targeted to, *inter alia*, those awaiting RDAP, those who
do not meet RDAP admission criteria, and those found guilty of an incident report for use of
drugs or alcohol. Id.  The third program is the nine-plus-month, 500-hour Residential Drug
Abuse Treatment Program (RDAP) for inmates with a diagnosable and verifiable substance
abuse disorder. Id.

 Congress has provided that priority for substance abuse treatment is based on an eligible
prisoner's proximity to release.  18 U.S.C. § 3621(e)(1)(C).  According to statute, "[t]he period a
prisoner convicted of a nonviolent offense remains in custody after successfully completing a
treatment program may be reduced by the Bureau of Prisons, but such reduction may not be
more than one year from the term the prisoner must otherwise serve." 18 U.S.C.A. §
3621(e)(2)(B); Keene v. Zuniga, 2019 WL 2393628 (W.D.Pa 2019).  A sentence of 37 months or
more can be reduced by 12 months, a sentence of 31-36 months can be reduced by 9 months and
a sentence of 24 months or less can be reduced by no more than 6 months.   BOP Program
Statement PS 5331.02 at § 10 ("Early Release Procedures') (May 26, 2016).  Because his offense
involves possession of a firearm, Mr. Skyfield is ineligible for early release so, were he to
receive the variant 60-month sentence he hereby seeks, Mr. Skyfield's successful completion of
the RDAP program would result in no additional sentence reduction. See Id. at
550.55(b)(4)(iii)(" An offense that involved the carrying, possession, or use of a firearm…;)

 RDAP facilities in the Northeast Region include Allenwood, Fort Dix and Schuylkill.
See https://www.bop.gov/inmates/custody_and_care/docs/rdap_locations_20180110.pdf;
https://www.federalprisontime.com/rdap-locations ( each visited last on February 20, 2024).
Should the Court believe the requested recommendation warranted, I respectfully suggest that
the court frames its recommendations in terms of the reasons underlying them. E.g. "The Court
recommends placement at FCI Ft. Dix to permit participation in the RDAP substance abuse
rehabilitation

**Page-13**
**letter to Hon. Liman, U.S.D.J.**
**April 23, 2024**

G.    <u>Placement</u>

"[A] court may make a recommendation concerning the type of prison facility appropriate for the defendant; and in this calculus, the presence of a rehabilitation program may make one facility more appropriate than another." <u>United States v. Crum</u>, 843 Fed.Appx. 404, 2006 WL 1976165 (2d Cir. 2021)(citing <u>Tapia v. United States</u>, 564 U.S. at 334 (2011).  "In determining whether to make a recommendation concerning the type of prison facility appropriate for the defendant, the court shall consider any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2)."   18 U.S.C. § 3582(a).  While 18 U.S.C. § 3621(b) neither requires that district courts make such recommendations nor that the BOP follow those that are made, see <u>United States v. Williams</u>, 65 F.3d 301, 307 (2d Cir. 1995) ("sentencing court has no authority to order that a convicted defendant be confined in a particular facility" because that decision is "within the sole discretion of the Bureau of Prisons"); accord <u>Levine v. Apker</u>, 455 F.3d 71, 83 (2d Cir. 2006); <u>Thye v. United States</u>, 109 F.3d 127, 130 (2d Cir. 1997), § 3621(b)(4)(B) does require the Bureau of Prisons ("BOP") to consider a district court's designation recommendation, among other factors, in discharging its responsibility for designating convicted federal defendants to appropriate penal facilities.

Because BOP nevertheless makes every effort to respect a district court's recommendations, Mr. Skyfield requests that the Court recommend placement in the N0rtheast Region, preferably Ft. Dix, closest to his mother and son.  See 18 U.S.C. § 3621 (b)(4)(B); Bureau of Prisons Program Statements PS 5140.28 and PS 5070.10 § 7 (a) & (b); <u>Woodall  v. Federal Bureau of Prisons</u>, 432 F.3d 235 (3d Cir. 2005) (sentencing court may recommend place of imprisonment).

H.    <u>Conclusion</u>

Nobody can say with any confidence that a 5-year-sentence is insufficient to deter future criminal conduct but what is certain is that were Mr. Skyfield to face further charges in the future, he would be a career offender with no arguments for mitigation left in his arsenal.  While it would not be the first time he has recently heard it, the Court should so inform him regardless of its chosen sentence.  For the forgoing reasons, Mr. Skyfield respectfully requests that the Court sentence him as suggested herein.

Respectfully submitted,

*Richard Palma*

Richard Palma

cc:  AUSAs Adam Margulies, Joseph Rosenberg, & Kevin Mead
      US Probation Officer John DePierri

Encl.